IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACIE L. DRAUGHON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  20-4015 |
| Commissioner of Social Security[1] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                                    December  29, 2022

 Stacie L. Draughon ("Plaintiff") seeks review of the Commissioner's decision

denying her applications for disability insurance benefits ("DIB") and supplemental

security income ("SSI").  For the reasons that follow, I conclude that the decision of the

Administrative Law Judge ("ALJ") is not supported by substantial evidence and remand

for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

 Plaintiff protectively filed for DIB and SSI on April 12, 2017, alleging disability

beginning on January 12, 2012, as a result of depression, sleep apnea, and high blood

pressure.  Tr. at 99, 100, 163, 170, 217.[2]  Plaintiff's applications were denied initially, id.

---

[1]Kilolo Kijakazi is currently the Acting Commissioner of Social Security, see
https://www.ssa.gov/agency/commissioner/ (last visited Sept. 14, 2022), and should be
substituted for Andrew Saul as the defendant in this action.  Fed. R. Civ. P. 25(d).  No
further action need be taken to continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]To be entitled to DIB, Plaintiff must establish that she became disabled on or
before her date last insured.  20 C.F.R. § 404.131(b).  The Certified Earnings Record in
the file indicates and the ALJ found that Plaintiff's date last insured is December 31,
2017.  Tr. at 23, 199; see also id. at 73, 242.  Thus, for purposes of the claim for DIB,
Plaintiff must establish disability prior to December 31, 2017.

at 101, 106, and Plaintiff requested a hearing before an ALJ, id. at 111, which took place

on January 24, 2019.  Id. at 38-64.[3]  On April 22, 2019, the ALJ issued a decision

concluding that Plaintiff was not disabled.  Id. at 20-32.  The Appeals Council denied

Plaintiff's request for review on July 7, 2020, id. at 1-3, making the ALJ's April 22, 2019

decision the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1472.

Plaintiff commenced this action in federal court on August 17, 2020, Doc. 1, and

the matter is now fully briefed and ripe for review.  Docs. 20, 21 & 23.[4]

## II.   LEGAL STANDARDS

To prove disability, a claimant must demonstrate an "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for . . . not less than twelve

months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process,

evaluating:

> 1.   Whether the claimant is currently engaged in substantial gainful activity;

---

[3]The ALJ originally convened the hearing on September 17, 2018, but Plaintiff requested additional time to obtain representation.  Tr. at 68-72.  At the hearing on January 24, 2019, Plaintiff was also unrepresented.  Id. at 40-41.

[4]The parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 6. Adjudication of the case was delayed by Defendant's requests for extensions of time to file the certified administrative record necessitated by transcription difficulties caused by the Covid-19 pandemic, Docs. 7 & 9, and Plaintiff's counsel's request for several extensions of time to file the Brief and Statement of Issues.  Docs.  12, 14, 16, 18.

2.      If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;

3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;

4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and

5.      If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is whether substantial evidence supports the Commissioner's conclusion that Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."

3

Zirnsak, 777 F.2d at 610 (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir.

2005)); see also Biestek v. Berryhill, __ U.S. __, 139 S. Ct. 1148, 1154 (2019)

(substantial evidence "means only – 'such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305

U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181

F.3d at 431.

III.    **DISCUSSION**

The ALJ found that Plaintiff had the severe impairments of obesity, major

depressive disorder ("MDD"), and bipolar disorder, as well as the non-severe

impairments of hypertension and obstructive sleep apnea, and that her impairments did

not meet or equal any of the Listings.  Tr. at 23.   The ALJ further found that Plaintiff

retained the RFC to perform a limited range of light work.  Id. at 25-26.  At issue are the

limitations imposed by her mental impairments, and as to those the ALJ limited Plaintiff

to "work involving simple, routine, and repetitive tasks; work with only occasional

simple decision making required and only occasional routine changes in the work

environment; no contact with the public; only minimal, brief, or superficial interaction

with co-workers; and only occasional interaction with supervisors." Id. at 26.  Based on

the RFC assessment and the testimony of a vocational expert ("VE"), the ALJ found that

Plaintiff could not perform her past relevant work as an audit clerk, but could perform the

jobs of final inspector, final assembler, and sorter/inspector.  Id. at 30-31.  Thus, the ALJ

found that Plaintiff was not disabled.  Id. at 32.

A.    <u>**Summary of the Record**</u>

Plaintiff was born on September 20, 1972, making her 44 years old at the time of her application (April 12, 2017), and 46 years old at the time of the ALJ's decision (April 22, 2019).  <u>Tr.</u> at 45-46, 163, 170.  She is 5'6" - 5'7" tall and weighs approximately 360 – 410 pounds.  <u>Id.</u> at 325, 327, 343, 352.[5]  She lives in a house with her mother, her mother's husband, and her own 23-year-old son.  <u>Id.</u> at 45, 236.  Plaintiff completed high school and two years of college with an associate's degree in secretarial business administration.  <u>Id.</u> at 46, 218.  Plaintiff worked as an auditor at a life insurance company from December 1999 to January 2012.  <u>Id.</u> at 47, 218.

1.    <u>Medical Treatment Record</u>[6]

On September 18, 2014, Plaintiff began treating with primary care physician, Barry Rinker, M.D., for ankle and knee problems.  <u>Tr.</u> at 379.  The doctor noted that Plaintiff complained of suffering from depression for at least ten years, that she was not working due to depression and a lack of motivation, and that she had gained 100 pounds and had sleep difficulties.  <u>Id.</u>  Relevant to Plaintiff's claims, Dr. Rinker diagnosed her

---

[5]In the Disability Report completed on June 21, 2017, Plaintiff reported that she weighed 428 pounds.  <u>Tr.</u> at 217.  She reported a 150-pound weight gain in approximately 2016.  <u>Id.</u> at 321.  Plaintiff was able to lose weight during some of the relevant period, for example she weighed 364 pounds on June 1, 2018, and 359 pounds on January 7, 2019.  <u>Id.</u> at 555, 600.

[6]Because Plaintiff claims that the ALJ failed to properly consider the records related to her mental health impairments, I will focus primarily on the records regarding those impairments.

with depression (major, recurrent) and morbid obesity, and prescribed fluoxetine.[7]  Id. at
382.  On March 4, 2015, Dr. Rinker's notes indicate that he suspected a diagnosis of
bipolar disorder, encouraged Plaintiff to seek psychiatric treatment, and prescribed
Zyprexa.[8]  On May 19, 2015, Dr. Rinker's notes indicate that Plaintiff had begun
treatment with a psychiatrist in Swarthmore.  Id. at 372.  In March 2016, Plaintiff
reported to Dr. Rinker that her psychiatrist "quit."  Id. at 368.  At that point, Dr. Rinker's
mental health diagnosis of Plaintiff was bipolar affective disorder and he continued her
on Zyprexa.  Id. at 370.  On April 18, 2016, Dr. Rinker noted that Plaintiff had started
with a new psychiatric practice and had been prescribed lamotrigine[9] with "gradual build
up."  Id. at 365.  Dr. Rinker noted that her mood was more sedate and her "thoughts not
as flying," and he described Plaintiff's bipolar affective disorder as "good," "bet[]ter now
seeing psych."  Id. at 365-66.

On March 30, 2016, Kimyette Willis, B.A., an intern at Crozer Keystone under the
supervision of Karen Zelaya Kendall, Ph..D., conducted a Biopsychosocial Evaluation,
noting Plaintiff's complaints of hopelessness, sleep disturbances, depressed and irritable
mood, isolation, loss of interest in activities, and low energy.  Tr. at 329-38.  Clinician

---

[7]Fluoxetine (brand Prozac) is an antidepressant.  See
https://www.drugs.com/search.php?searchterm=fluoxetine (last visited Dec. 7, 2022).

[8]Zyprexa (generic olanzapine) is an antipsychotic used to treat schizophrenia and
bipolar disorder.  See https://www.drugs.com/mtm/olanzapine.html (last visited Dec. 7,
2022).

[9]Lamotrigine (brand Lamictal) is an anticonvulsant used to delay mood episodes
in adults with bipolar disorder.  See https://www.drugs.com/mtm/lamotrigine.html (last
visited Dec. 8, 2022).

Willis diagnosed Plaintiff with MDD and post-traumatic stress disorder ("PTSD")[10] and

recommended a psychiatric evaluation, individual psychotherapy, and referral to peer

specialist services to address Plaintiff's social issues. Id. at 338. David Rackow, M.D.,

conducted a psychiatric evaluation on April 1, 2016, noting Plaintiff's complaints of

racing thoughts and sleep disruption. Id. at 328. Dr. Rackow also noted that when

Plaintiff became more depressed in 2012 she quit her job as an insurance adjuster and

began to isolate herself. Id. The doctor diagnosed Plaintiff with bipolar I disorder (most

recent episode depressed), social phobia,[11] PTSD, and amphetamine dependence in

remission, and assessed her with a Global Assessment of Functioning ("GAF") score of

30.[12] Id. The doctor prescribed Lamictal and dialectical behavioral therapy. Id.

---

[10]The essential feature of MDD is a clinical course that is characterized by one or more major depressive episodes. Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2012) ("DSM 5"), at 160-61. A major depressive episode is a period of at least two weeks during which there is either depressed mood or the loss of interest or pleasure in nearly all activities. Id. at 163. "The essential feature of [PTSD] is the development of characteristic symptoms following exposure to one or more traumatic events." Id. at 274. The clinical presentation can be predominated by fear-based re-experiencing, emotional, and behavioral symptoms, anhedonic or dysphoric mood states and negative cognitions; arousal and reactive-externalizing symptoms; and/or dissociative symptoms. Id.

[11]Diagnosis of bipolar I disorder ("the classic manic-depressive disorder") requires a manic episode preceded by or followed by a hypomanic or major depressive episode. DSM 5 at 123. "The essential feature of social anxiety disorder [social phobia] is a marked, or intense, fear or anxiety of social situations in which the individual may be scrutinized by others." Id. at 203.

[12]A GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health. Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM-IV-TR"), at 34. A GAF score of 21-30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) [or] inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Id. The DSM 5,

When Plaintiff saw Dr. Rinker on September 28, 2016, she told him that she was not taking any psychiatric medications, was not seeing her psychiatrist, and "need[ed] to [go] back." Tr. at 361.  She resumed mental health treatment at Crozer Keystone on November 3, 2016, stating that nothing was enjoyable and she did not want to be around people. Id. at 324-25.  At that time, Christopher Milburn, M.D., noted that Plaintiff had rapid speech, mild flight of ideas and mild grandiosity suggestive of manic symptoms, with a mildly irritable affect. Id. at 325.  Dr. Milburn diagnosed Plaintiff with bipolar disorder II[13] and a rule out diagnosis of cluster B personality traits,[14] started Plaintiff on Depakote,[15] and planned to send Plaintiff for psychotherapy when hypomanic symptoms are better controlled. Id.

---

which replaced the DSM-IV-TR, eliminated reference to the GAF score.  However, the Commissioner continues to receive and consider GAF scores in mental evidence, see Administrative Message-13066(July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case. Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016).

[13]"Bipolar II disorder is characterized by a clinical course of recurring mood episodes consisting of one or more major depressive episodes . . . and at least one hypomanic episode." DSM 5 at 135.

[14]"The essential feature of a personality disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture and is manifested in at least two of the following areas:  cognition, affectivity, interpersonal functioning, or impulse control." DSM 5 at 647.  Personality disorders are grouped based on descriptive similarities. Id. at 646.  "Cluster B includes antisocial, borderline, histrionic, and narcissistic personality disorders. Individuals with these disorders often appear dramatic, emotional, or erratic." Id.

[15]Depakote is an anticonvulsant used to treat manic episodes related to bipolar disorder.  See https://www.drugs.com/depakote.html (last visited Dec. 8, 2022).

In a Mental Health Treatment Plan prepared on January 23, 2017, psychologist Stephen G. Glass, Ed.M., noted that Plaintiff was depressed with a "numb" mood, was short-tempered, suffered with sleep issues, social avoidance and isolation, and remained at home in her bedroom 19 of 24 hours a day, 13 hours of which she is asleep.  Tr. at 321-22.  In the Treatment Plan dated May 22, 2017, Dr. Milburn noted diagnoses of bipolar II disorder, most recent episode depressed, moderate, and cluster B personality traits.  Id. at 311.  At a medical visit on May 24, 2017, Dr. Rinker noted that Plaintiff's mood was bland and she was seeing the psychiatrist, but Plaintiff's insurance was balking at the psychiatrist's attempt to prescribe Abilify.[16]  Id. at 357.

Dr. Glass's individual psychotherapy notes evidence Plaintiff's isolation and avoidance issues.  See, e.g., tr. at 403 (5/8/17 – spends most of the time in her bedroom avoiding family conflict), 399 (6/12-17 – acute anxiety/discomfort in a crowd when attending son's high school graduation), 525 (7/24/17 – "remaining in her home for the most part"), 522 (9/11/17 – "continues to spend many days in her bedroom ruminating/fantasizing as a way of not thinking about things that make/have made her depressed"), 518 (10/9/17 – patient reports frequently sleeping), 491 (4/16/18 – continues social avoidance).  The notes indicate various medication changes.  See id. at 413 (3/13/17 – taking Depakote), 509 (11/27/17 – began Zoloft[17]), 496 (3/19/18 – stopped

---

[16]Abilify (generic aripiprazole) is an antipsychotic used alone or with a mood stabilizer to treat bipolar I disorder.  See https://www.drugs.com/abilify.html (last visited Dec. 8, 2022).

[17]Zoloft (generic sertraline) is an antidepressant.  See https://www.drugs.com/zoloft.html (last visited Dec. 8, 2022).

Zoloft on report it caused panic symptoms), 491 (4/16/18 - taking Wellbutrin[18]).

Throughout this period, Dr. Glass frequently found that Plaintiff had a constricted affect

and impaired insight/judgment, but otherwise had normal mental status exam ("MSE").

The June 1, 2018 Mental Health Treatment Plan indicates diagnoses of bipolar II

disorder, most recent episode depressed, moderate, and cluster B personality traits, as

well as obesity and sleep apnea, and notes that Plaintiff continues with "social

avoidance/isolation (remains at home in bedroom; 19/24 hrs per day in bed/sofa, 7-8 of

those hrs asleep + naps)." Id. at 555.

    After starting Wellbutrin, Plaintiff reported sleeping better and getting out of the

house. Tr. at 579 (6/25/18).  On October 8, 2018, Dr. Glass noted that Plaintiff related

"irregular use of Wellbutrin XL" and his notes indicate that Plaintiff's progress in getting

out of the house was then "variable." Id. at 571.  The Treatment Plan dated October 1,

2018, indicates diagnoses of PTSD and social phobia in addition to bipolar II and cluster

B personality traits, and notes "[n]o significant positive change since last tx plan." Id. at

553.  The Treatment Plan dated January 17, 2019, also states that Plaintiff "[r]emains in

bedroom/living room watching TV.  No significant positive change since last tx plan."

Id. at 600.

    None of Plaintiff's treatment providers completed an RFC evaluation addressing

her physical or mental abilities to perform work.  Paul Taren, Ph.D., found from a review

of the record at the initial stage that Plaintiff suffered from depressive, bipolar, and

---

    [18]Wellbutrin (generic bupropion) is an antidepressant.  See
https://www.drugs.com/wellbutrin.html (last visited Dec. 8, 2022).

related disorders, and personality impulse control disorders, and that she suffered from mild limitations in her ability to understand, remember, or apply information, and moderate limitation in her abilities to interact with others; concentrate, persist or maintain pace; and adapt or manage oneself.  Id. at 77, 90.

2. Testimony

At the administrative hearing, Plaintiff tried to explain that she could not work because she would have to be around people and feels anxious.[19]  She explained that she left her job in the billing department of an insurance company because she was overwhelmed with the demands of her work life, home life, and commute, and felt that she was being judged and criticized.  Tr. at 49-51.  At the time of the hearing, Plaintiff testified that she was taking bupropion, Risperdal, loratadine, and hydrochlorothiazide, and explained that the doctor had just increased the dose of bupropion and added Risperdal.[20]  Id. at 53-54.  Plaintiff explained that the medications cause sleep disruption and dry mouth.  Id. at 54.  She said that she sleeps whenever she gets the chance because "the thoughts just get too much, and I . . . go to sleep so I don't have to think."  Id.

_____

[19]As noted, supra n.3, Plaintiff was not represented at the hearing, and her testimony is somewhat rambling and difficult to piece together.  See, e.g., tr. at 52 (Plaintiff started to explain that she did not think she could perform a job "that's out," switched to talking about work-from-home jobs, and ended talking about frustrations waiting for a bus.)

[20]Risperdal is an antipsychotic used to treat symptoms of bipolar disorder.  See https://www.drugs.com/risperdal.html (last visited Dec. 8, 2022).  Loratadine is an antihistamine.  https://www.drugs.com/loratadine.html (last visited Dec. 8, 2022).  Hydrochlorothiazide is a diuretic that helps prevent your body from absorbing too much salt, which can cause fluid retention.  See https://www.drugs.com/hctz.html (last visited Dec. 8, 2022).

Plaintiff testified that she does not have difficulties paying attention or concentrating or remembering "regular things." Tr. at 56. However, when asked about getting along with other people, Plaintiff explained that she tries to come in contact with as few people as possible. Id. at 57. When the ALJ asked about the goal in her Mental Health Treatment Plan with Dr. Glass that she leave the house for at least 45 minutes 6 times a week, Plaintiff responded that "it's not going well," explaining that the furthest she goes, other than when traveling in her mother's car, is the front steps. Id. at 57. Other than medical appointments, Plaintiff testified that she will go to family gatherings for holidays, where she stays in a different room, "[b]ut . . . get[s]credit for going." Id. at 59.

A VE also testified at the hearing, classifying Plaintiff's past work as an audit clerk as a sedentary, skilled job. Tr. at 61. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and past work experience who could perform light work; using their upper extremities for pushing and pulling consistent with the lifting and carrying requirements of light work, with occasional operation of foot controls; never climb ladders, ropes, or scaffolds; occasionally climb ramps or stairs; occasionally balance, stoop, kneel, crouch, and crawl; with only occasional exposure to non-weather related extreme cold and hot temperatures; only occasional exposure to wetness and humidity; no exposure to excessive vibration; only occasional exposure to pulmonary irritants such as fumes, odors, dusts and gases; no exposure to poorly ventilated areas; no exposure to dangerous machinery with moving mechanical parts; no exposure to unprotected heights; limited to work involving simple, routine, and repetitive

tasks; with only occasional simple decision making required; and only occasional routine

changes in the work environment; with no contact with the public; only minimal, brief, or

superficial interaction with coworkers; and only occasional interaction with supervisors.

Id. at 61-62.  The VE testified that such a person could not perform Plaintiff's past work,

but could perform the jobs of final inspector, final assembler, and a sorter/inspector.  Id.

at 62.[21]

### B.    Plaintiff's Claims

Plaintiff claims that the ALJ failed to (1) properly consider the evidence regarding

Plaintiff's mental functional limitations when considering whether Plaintiff's

impairments met or equaled the Listings and in determining Plaintiff's RFC, and (2)

failed to consider Plaintiff's diagnoses of PTSD, cluster B personality traits, and social

anxiety disorder.  Doc. 20 at 3-30; Doc. 23 at 6-10.  Defendant responds that the ALJ's

determination is supported by substantial evidence, and that the ALJ's failure to consider

additional mental health listings is harmless because the same criteria discussed by the

ALJ apply to the other listings.  Doc. 21 at 5-17.

### 1.    Consideration of Mental Functional Limitations

Plaintiff claims that the ALJ erred in considering the evidence relating to mental

functional limitations in considering whether she met the relevant mental health listings,

referred to as the "B criteria," and in considering her RFC.  In considering the ALJ's

---

[21]When the ALJ asked if someone could work with no contact with the public,
coworkers, and supervisors, the VE testified that such a limitation was inconsistent with
competitive employment.  Tr. at 63.

analysis, the Third Circuit has instructed that "when there is a conflict in the evidence,

the ALJ may choose which evidence to credit and which evidence not to credit, so long

as she does not "reject evidence for no reason or for the wrong reason." Rutherford v.

Barnhart, 399 F.3d 546, 554 (3d Cir. 2005); Plummer v. Apfel, 196 F.3d 422, 429 (3d

Cir. 1991).

Plaintiff begins by arguing that the ALJ erred in determining that she had a

marked, rather than extreme, limitation in interacting with others.  Doc. 20 at 5-9.  This

difference is significant because "[t]o satisfy the paragraph B criteria, your mental

disorder must result in "extreme" limitation of one or "marked" limitation of two, of the

four areas of mental functioning."  20 C.F.R. Pt. 404, Subpt. P, App.1 §12.00(A)(2)(b).[22]

A marked limitation means that the "functioning in the area independently, appropriately,

effectively, and on a sustained basis is seriously limited;" whereas an extreme limitation

means that the claimant is "not able to function in this area independently, appropriately,

effectively, and on a sustained basis."  Id. § 12.00(F)(2)(d) & (e).

In concluding that Plaintiff has a marked limitation interacting with others, the

ALJ found:

> [Plaintiff] alleged she has difficulty getting along with and
> being around others, and typically does not leave her home as
> doing so is extremely difficult.  The undersigned agrees with
> [Plaintiff's] allegations, as the record discussed in further
> detail below, shows [Plaintiff] has issues interacting with

---

[22]The ALJ specifically considered Listing 12.04, which addresses depressive, bipolar, and related disorders, and found that Plaintiff did not meet the B criteria (functional limitations) of the listing without addressing the A criteria (medical diagnoses).  Tr. at 24-25.

others.  Based on these facts, and the evidence discussed
below, marked limitation is found in interacting with others.

Tr. at 24.  Later in the RFC section of her decision the ALJ reviewed some of Plaintiff's

mental health treatment records, focusing on Dr. Glass's psychotherapy notes and MSEs,

noting that Plaintiff reported improvement after beginning treatment with a psychiatrist in

April 2016, id. at 27 (citing id. at 366), was doing better with routine things in February

2017, id. at 27 (citing id. at 419), and reported that she was doing "pretty good" and

trying to interact with others more in December 2017.  Id. at 27 (citing id. at 507).  The

ALJ also noted several unremarkable mental status findings, other than constricted affect

and impaired insight and judgment.  Id. at 27-28.

The problem with the ALJ's cursory review is that it lacks context.  Dr. Glass's

notes indicating mostly normal mental status findings also evidence the extent of

Plaintiff's social avoidance and isolation.  For example, Plaintiff has consistently failed at

achieving treatment goals regarding socialization, which were modified in recognition of

the extent of her isolation.  See tr. at 504 (1/15/18), 501 (2/19/18), 499 (3/5/18), 498

(3/12/18) (each setting a goal of one social activity a week which plaintiff was not

meeting), id. at 613 (12/10/18), 612 (12/17/18), 610 (1/7/19), 609 (1/14/19), 607

(1/21/19), 606 (1/28/19), 605 (2/11/19) (each setting a goal of one social activity every

six weeks).  During this period, another of Plaintiff's objectives was to go out of the

house for 30 minutes twice a week, for which Dr. Glass noted "variable" progress.  Id.

However, at the administrative hearing, Plaintiff explained that "the furthest I go without

being inside of my mother's car is pretty much . . . the front steps."  Id. at 57-58.  At a

minimum, this suggests that the ALJ's reliance on positive self-reporting and unremarkable MSE findings does not accurately reflect the nature or extent of Plaintiff's isolative impairment.

The Mental Health Treatment Plans offer more details regarding Plaintiff's long-term difficulties than do the MSEs.   On January 23, 2017, the Mental Health Treatment Plan stated that one of Plaintiff's problems is social avoidance/withdrawal/isolation and, at that time, she "remains at home in bedroom; 19/24 hrs per day in bed, 13 of those hrs asleep," and notes that she is "concerned that people judge her/are negatively critical of her leading to social avoidance." Tr. at 321.  Dr. Glass set as an objective that Plaintiff "will report daily practice, AM Routine:  wake up; wash; dress in street clothes; breakfast; bathroom; out of home for social;/recreational/physical activity." Id.  In the May 22, 2017 Mental Health Treatment Plan, Dr. Glass noted modest improvement in Plaintiff's sleep pattern, but that she remained at home in her bedroom 19 hours a day. Id. at 311.

In the September 18, 2017 the Mental Health Treatment Plan, Dr. Glass noted that Plaintiff made "[n]o significant positive change since last tx plan -- No pt enactment of tx plan objectives, and that she continued to spend 19 hours in the bedroom. Tr. at 482.  Dr. Glass identified as one of Plaintiff's treatment objectives that Plaintiff would leave the house daily for social/recreational/physical/employment activity. Id.  The Treatment Plan dated December 18, 2017, showed no progress with this objective. See id. at 480 ("Remains in bedroom/living room watching TV.  No significant positive change since last tx plan.").  One of the Plaintiff's objectives in that Treatment Plan was to participate

in social activity at least once a week.  Id.  Again, in the March 15, 2018 Treatment Plan,

Dr. Glass noted "Remains in bedroom/living room watching TV.  No significant positive

change since last tx plan."  Id. at 475.  At that point, one of the Treatment Plan objectives

stated that Plaintiff was to "report daily practice, AM Routine:  wake up; wash; dress in

street clothes; breakfast; bathroom; out of home for social/recreational/physical activity x

6 months."  Id.  Again, Plaintiff showed no progress in June 2018.  Id. at 555.  This

scenario repeated itself in the Treatment Plans dated June 1, 2018, October 1, 2018, and

January 7, 2019.  Id. at 555 (June 1, 2018 – "No significant positive change," new

objective – participate in at least one social activity per month for six months), 553

(October 1, 2018 – "No significant positive change," new objective – participate in at

least one social activity per six weeks for six months), 600 (January 7, 2019 – "No

significant positive change," new objective – participate in at least one social activity

with one person per month for six months).

      The Treatment Plans are significant for two reasons.  First, they evidence

Plaintiff's complete failure to socialize or get out of the house during this period.

Second, the changes in the objectives -- from daily activity outside the house to one

social activity at least once a month to one social activity every six weeks -- evidences

her treatment provider's recognition of the severity of her isolation and social avoidance.

Although the ALJ considered individual treatment notes and the MSEs, the ALJ failed to

acknowledge the Treatment Plans or Plaintiff's long-term failure to meet the objectives

set in the Treatment Plans -- even minimal objectives related to socializing and leaving

the house.

As previously noted, the court must determine if the Commissioner's decision is supported by substantial evidence.  Schaudeck, 181 F.3d at 431; Poulos, 474 F.3d at 91. "This standard is not met if the Commissioner 'ignores, or fails to resolve, a conflict created by countervailing evidence."  Bailey v. Comm'r of Soc. Sec., 354 F. App'x 613, 616 (3d Cir. 2009) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)).  Here, the ALJ failed to consider the larger picture of Plaintiff's mental health treatment as evidenced in the Mental Health Treatment Plans, and the ALJ's reliance on benign mental status findings and occasional positive notations in Dr. Glass's notes is inadequate to properly consider the mental health treatment evidence both in considering the B criteria of the relevant mental health listings and in determining Plaintiff's RFC.

Therefore, I will remand the case for further consideration of the mental health treatment record.  I note that the record does not include any mental health RFC assessment from Plaintiff's treatment providers; nor was Plaintiff seen by any consultative mental health examiner who opined on her mental abilities.  The only mental RFC in the record came from Dr. Taren who conducted a record review on July 31, 2017. See tr. at 77-78, 82-84.  Based on the date of his record review, Dr. Taren did not have the benefit of the more recent Mental Health Treatment Plans discussed above.  On remand, Defendant should obtain an up-to-date mental RFC assessment.

In addition to challenging the ALJ's finding with respect to her ability to interact with others, Plaintiff also challenges the ALJ's determination with respect to her functional limitations relating to the other categories in the B criteria (understanding, remembering, or applying information; concentrating, persisting, or maintaining pace;

18

and adapting or managing oneself) of the relevant mental health listings.  Doc. 20 at 9-16.

Having already determined that the ALJ's consideration of the mental health treatment

record was lacking, on remand, Defendant shall consider the mental health treatment

evidence with respect to all of the categories of functioning listed in the B criteria of the

relevant mental health listings.

### 2.   Other Mental Health Diagnoses

Finally, Plaintiff also complains that the ALJ failed to acknowledge and address

mental health diagnoses beyond MDD and bipolar disorder.  Doc. 20 at 23-24 (noting

diagnoses of cluster B personality traits, PTSD, and social anxiety disorder).  On remand,

Defendant shall address the other diagnoses contained in the mental health treatment

record and include the limitations attributable to all of Plaintiff's mental health

impairments regardless of their severity in considering her RFC.[23]

## IV.   CONCLUSION

The ALJ failed to properly consider the mental health treatment evidence in

considering the B criteria of the relevant mental health listings and in determining

Plaintiff's RFC.  In addition, the only mental RFC in the administrative record was

prepared by a doctor reviewing the record at the initial consideration stage prior to the

Mental Health Treatment Plans evidencing the extent of the difficulties Plaintiff has,

---

[23]In her brief, Plaintiff complains about a statement in the ALJ's decision regarding Plaintiff's difficulty "paying attorney."  Doc. 20 at 9 (quoting Tr. at 24-25). Rather than a suggestion of error as Plaintiff maintains, this appears to by a typographical error, because in context it appears likely that the ALJ was referring to Plaintiff's ability to pay attention.

specifically with socialization.  On remand, Defendant shall obtain an updated mental RFC assessment, consider all of the mental health treatment evidence in considering all of the applicable mental health listings and determining Plaintiff's RFC, and obtain additional vocational evidence if necessary.

An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACIE DRAUGHON | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, Acting | : | NO.  20-4015 |
| Commissioner of Social Security | : | |

**O R D E R**

AND NOW, this  29th   day of December, 2022, upon consideration of Plaintiff's

request for review (Doc. 20), the response (Doc. 21), Plaintiff's reply (Doc. 23), and after

careful consideration of the administrative record (Doc. 11), IT IS HEREBY ORDERED

that:

1.  Judgment is entered REVERSING the decision of the Commissioner of
    Social Security for the purposes of this remand only and the relief sought
    by Plaintiff is GRANTED to the extent that the matter is REMANDED
    pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further
    proceedings consistent with this adjudication; and

2.  The Clerk of Court is hereby directed to mark this case closed.


BY THE COURT:

/s/ Elizabeth T. Hey

_____
ELIZABETH T. HEY, U.S.M.J.